IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A SEARCH
WARRANT FOR A BLACK IPHONE
WITH A BLACK CASE LOCATED AT
THE FBI FIELD OFFICE IN BEDFORD,
NEW HAMPSHIRE

Case No. 25-mj-200-01-AJ

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR SEARCH WARRANT**

I, Tyler Delorme, a Special Agent with the Federal Bureau of Investigation ("FBI"), being

duly sworn, depose and state as follows:

**AGENT BACKGROUND**

1.      I have been employed as an FBI Special Agent since 2017, and am currently

assigned to the Boston Field Office, Bedford Resident Agency.  I am a federal law enforcement

officer who is engaged in enforcing criminal laws, including 18 U.S.C. §§ 2251 and 2252A, and

I am authorized by the Attorney General to request a search warrant. While employed by the

FBI, I have investigated federal criminal violations related to high technology or cyber-crime,

child exploitation, and child pornography.  I have received training in the area of child

pornography and child exploitation and have had the opportunity to observe and review

numerous examples of child pornography (as defined in 18 U.S.C. § 2256) in all forms of media,

including computer media.

2.      I submit this affidavit pursuant to Federal Rule of Criminal Procedure 41, in

support of an application for a search warrant authorizing the search of a Black iPhone in a Black

Otterbox case seized from the person of Brian Hargraves ("HARGRAVES") incident to his

arrest on May 20, 2025, located at the FBI field office in Bedford, New Hampshire, as more fully described in Attachment A of this affidavit (the "TARGET DEVICE").

3.     Based on the information set forth in this affidavit, there is probable cause to believe that the TARGET DEVICE contain evidence of, or property intended for use in committing, violations of 18 U.S.C. § 1512 (tampering with a witness), 18 U.S.C. § 2251(a) (production of child pornography), U.S.C. §§ 2252(a)(4)(B) and (b)(2) (possession of and access with intent to view a visual depiction of a minor engaged in sexually explicit conduct), and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) which items are more specifically described in Attachment B of this Affidavit. Moreover, I respectfully submit that there is probable cause to believe that a search of the TARGET DEVICE, further identified in Attachment A, for the items and information more particularly described in Attachment B, will yield evidence of the aforementioned violations.

4.     This affidavit is based on my personal investigation and investigation by others, including federal and local law enforcement officials whom I know to be reliable and trustworthy.  The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation as well as through other means. This affidavit does not include every fact known to me about this investigation, but rather only those facts sufficient to establish probable cause.

## STATUTORY AUTHORITY

5.     As noted above, this investigation concerns alleged violations of the following statutes described below:

a.    Under 18 U.S.C. § 1512, whoever "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--

(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
…
(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
…
or
…
(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense…

shall be imprisoned up to 20 years. Both a federal trial and a federal grand jury investigation are "official proceedings" within the meaning of the statute. *See* 18 U.S.C. § 1515(a)(1)(A).

b.    Under 18 U.S.C. §§ 2251(a) and (e), "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in … any sexually explicit conduct for the purpose of producing any visual depiction of such conduct" shall be "fined under this title and be imprisoned not less than 15 years nor more than 30 years".

c.    18 U.S.C. § 2252(a)(4)(B) and (b)(2) prohibit any person from knowingly possessing or accessing with the intent to view, or attempting or conspiring to possess or access with the intent to view, one or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if the

3

production of such visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct.

     d.    18 U.S.C. § 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

6.    The following definitions apply to this Affidavit and Attachment B:

     a.    "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

     b.    "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

     c.    "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph (in whatever form, e.g., digital and printed photographs), film, video, picture, or computer or computer-generated image or picture,

whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct or the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

d.      "Child sexual abuse material" or "CSAM," as used herein, has the same meaning as the term "child pornography," defined above.

e.      "Cloud storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

f.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices.  *See* 18 U.S.C. § 1030(e)(1).

g.      "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

h.      "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other

memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

     i.     "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

     j.     "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

     k.     "Computer software," as used herein, is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

     l.     A provider of "Electronic Communication Service", as defined in 18 U.S.C. § 2510(15), is any service that provides to users thereof the ability to send or receive wire

or electronic communications.  For example, "telephone companies and electronic mail companies" generally act as providers of electronic communication services.  See S. Rep. No. 99-541 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3568.

m.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.  The internet is a means or facility of interstate or foreign commerce.

n.      "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

o.      An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.

p.      A "link," "hyperlink," "Uniform resource locator," "URL," "URL link," or "web address" all refer to the location of a specific webpage on a computer network such as the internet.  These locations are represented by a series of characters and symbols in a standard form that, when clicked, tapped, or inserted into a web browser, instructs the

computer to fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet. From the perspective of a computer user, that user will be redirected another location or web page on the Internet or another network. URLs often take the form of "https://www.google.com" or "https://www.justice.gov." URLs can also specific a specific page or file within a larger website, such as "https://www.justice.gov/psc" or "https://www.fbi.gov/investigate/violent-crime/vcac."

q.    "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

r.    "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

s.    "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

t.    "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

u.    "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

v.    A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

w.    "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

## **PROBABLE CAUSE**

7.    In July of 2022, Minor Victim 1 (MV1) met HARGRAVES on the social media messaging application "Purp."  Purp is a free application that can be downloaded on any Android or iPhone device. Purp is used by people to meet new friends, dating and other social uses.  Purp states that users must be at least 13 years old. To sign up to use Purp, users must upload a picture and add a location. The application does not verify the information that is posted on the user profile.

8.    In his communications with MV1, HARGRAVES identified himself as an 18-year-old boy living in in New Jersey, and later New Hampshire.  HARGRAVES told MV1 that his father worked in law enforcement, and he had two sisters named Brooke and Brianna.  MV1 was a 15-year-old girl and HARGRAVES was told on several occasions that MV1 was only 15 years old. MV1 at all relevant times resided with her parents in New Jersey. The chatting between MV1 and HARGRAVES moved from Purp over to other applications, including SnapChat and iMessage.  SnapChat is a social media application by which users can share private messages, pictures, and videos. iMessage is a text messaging application.

9.      Between July 2022 and February 2023, MV1 and HARGRAVES communicated frequently. They talked on the phone and exchanged SnapChat messages and text messages. MV1 told investigators that it was a man's voice on the phone and HARGRAVES refused to video chat with MV1 due to him being "insecure."

10.     HARGRAVES and MV1 made plans on a few occasions to meet in person, but those plans never came to fruition as HARGRAVES would back out.

11.     During a child forensic interview, MV1 disclosed that she sent pictures and videos of herself to HARGRAVES using SnapChat and iMessage.  MV1 disclosed that she sent images of her breast, buttocks and vagina. The images were a mix of some with clothes and some nude.  MV1 did not recall if HARGRAVES specifically requested these images and videos, but she stated that HARGRAVES was complimentary of the images. MV1 disclosed that she sent HARGRAVES "a lot" of images. MV1 was unsure of the actual number of videos and images but estimated that it was more than 20 but less than 100.

12.     After being confronted by her parents about the relationship with HARGRAVES, MV1 deleted all images, videos and chats with HARGRAVES from her phone. HARGRAVES and MV1 last communicated substantively in the spring of 2023.

13.     Based on Snapchat, email, and phone number subscriber information, law enforcement was able to identify HARGRAVES as the one communicating with MV1. Additionally, information provided by HARGRAVES to MV1, including his name, family members names, location, and other information, corroborated that HARGRAVES was the person posing as a teenage boy in his communications with MV1.

14.     Further law enforcement investigation revealed that HARGRAVES was in fact a 54-year-old man residing in Albany, New Hampshire.

15.     On April 25, 2025, this Court authorized search warrants for HARGRAVES person, vehicle, and residence. See Case Nos. 25-mj-82-01-TSM; 25-mj-83-01-TSM; 25-mj-84-01-TSM.

16.     On April 29, 2025, law enforcement executed the search warrants. HARGRAVES' Apple iPhone 16 phone was seized from his person and searched in accordance with the search warrant of HARGRAVES' person. The Court later issued a warrant to search HARGRAVES Snapchat account. See 25-mj-92-01/02-TSM.

17.     Law enforcement observed communications on the Apple iPhone 16 that appeared to indicate that HARGRAVES was communicating with multiple other minors and was romantically involved with them.

18.     For example, law enforcement observed a Snapchat conversation between HARGRAVES and another user ("MV2") where the two communicated on the application nearly every day dating back from December 2023 to April 30, 2025.

19.     When examining the photos or that were shared by MV2 with HARGARVES via SnapChat, it was clear to investigators that the photos from MV2 appeared to depict a young teenage female. The young teenage female appeared to be a minor. Some of the photos that were sent contained sexual material such as the young teenage female posing in sexual positions, photos of her showing her underwear, and photos of her in a bra.  There were also photos that, based on my training and experience, appeared to be depict the minor after masturbation, i.e., photos of her showing her fingers that appear to show bodily fluid.

20.     Investigators were able to determine that MV2 is a 15-year-old female. FBI agents located MV2 and her mother on April 30, 2025, and spoke with them. MV2 and her mother were shocked that HARGRAVES was actually a 54-year-old man and not a teenage boy

as they believed. MV2 said she and HARGRAVES have been in a relationship for about a year

and a half, that HARGRAVES pays her cell phone bill, and has sent money to pay for repairs to

her mother's car. MV2 consented to FBI agents taking her cell phone for imaging and gave them

permission to search her Snapchat account.

21.    During the interview of MV2, she disclosed to agents that HARGRAVES called

her on April 30, 2025, the day after the search warrants were executed, and told her that she

needed to delete her Snapchat account. MV2 complied with HARGRAVES' request and deleted

her Snapchat account.

22.    Based on the timing of HARGRAVES reaching out to MV2 and asking her to

delete her Snapchat account, there is probable cause to believe that HARGRAVES intended for

MV2 to delete materials that were relevant to and could be evidence in a federal grand jury

investigation.

23.    When examining HARGRAVES' Apple iPhone 16 further, law enforcement

located a number of photos and videos of another young female ("MV3"), who appears to be a

minor, in which MV3 is naked and/or masturbating. These videos appear to meet the definition

of CSAM in the abovementioned statutes. In another video of MV3, it shows her holding her

High School identification card, with the school name and her name on the card.  By observing

the dates of the videos included in the metadata and Snapchat records, and after learning MV3's

birthdate, it appears that MV3 was 16 years old at the time the videos were made.

24.    MV3 was forensically interviewed by law enforcement. During that interview,

MV3 disclosed that she met HARGRAVES online and that he told her he was a teenage boy.

MV3 communicated regularly over the course of at least several months with HARGRAVES.

During that time, HARGRAVES frequently asked MV3 to send sexually explicit videos of herself to him.

25.     A review of HARGRAVES' devices revealed at least one additional victim ("MV4"), with whom HARGRAVES was communicating regularly and involved with romantically. MV4 gave an interview with law enforcement in which she explained that she met HARGRAVES online and that he claimed to be a teenage boy. MV4 stated that she sent sexually explicit photos and videos of herself to HARGRAVES.

26.     A Criminal Complaint charging HARGRAVES with one count of Possession of and Access with Intent to View Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) was obtained on May 20, 2025, and HARGRAVES was arrested that day. The TARGET DEVICE was seized from HARGRAVES' person at that time.[1] A Grand Jury subsequently returned an Indictment against HARGRAVES for the same offense. *See* Case No. 25-cr-00048-LM-AJ, ECF No. 3.

27.     Investigators believe that HARGRAVES obtained the TARGET DEVICE after his other devices were seized on April 29, 2025. Based on the timing of his messages with MV2, investigators further believe that HARGRAVES used the TARGET DEVICE to communicate with MV2 about deleting her Snapchat account on April 30, 2025.

28.     Based on the preceding paragraphs, probable cause exists to believe that there is evidence of a violations of 18 U.S.C. § 1512, 18 U.S.C. § 2251(a), U.S.C. §§ 2252(a)(4)(B) and (b)(2), and 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) located on the TARGET DEVICE.

## CHARACTERISTICS OF INDIVIDUALS WITH A
## SEXUAL INTEREST IN CHILDREN

---

[1] HARGRAVES has been in Federal custody since his arrest and has not requested that the TARGET DEVICE be returned to him.

29.     Based on my training and experience, I am aware that individuals who have a sexual interest in children often use cell phones to communicate with multiple minors or adult intermediaries for sexual purposes. I am also aware that said individuals may have multiple cell phones to communicate with minors or other individuals about engaging in sexual activity with minors to avoid detection by others, including law enforcement.

30.     Additionally, I know, from my training and experience, that individuals with a sexual interest in children tend to view and maintain child pornography on their electronic devices. As a result, law enforcement is generally able to recover media files of child pornography from electronic devices and may be able to recover evidence of such files even if the files have been deleted.

31.     I also know based on my training and experience that older records can be downloaded to or accessed by newer devices. For instance, a user may log into an electronic cloud storage account on a new device and thereby access files and records from the new device that pre-dated the user acquisition of the device. The same is true of records and communications that a user can access by logging into pre-existing application accounts, such as a Snapchat account, on a new device.

32.     These individuals may also have images of minors that do not rise to the level of child pornography, but which nonetheless provide insight and corroboration into their deviant sexual fantasies involving minors. For instance, offenders have been known to take and maintain photographs and video recordings of fully clothed minors, not just in sexually provocative poses, but in public places and elsewhere (such as beaches, parks, and so forth), to collect, review, and fulfill their sexual fantasies. This sort of material, although not overtly sexual, further demonstrates that the defendant has a sexual interest in minors.

**Investigators' Possession of the Target Equipment**

33.    The TARGET DEVICE is currently being stored in evidence at the FBI field office in Bedford, New Hampshire.  From my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that it has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when it first came into the investigators' possession.

**Biometric Information**

34.    The warrant I am applying for would permit law enforcement to obtain from HARGRAVES the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant.  I seek this authority based on the following:

a.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices like iPhones, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

b.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to

five fingerprints that can unlock a device. Once a fingerprint is registered, a
user can unlock the device by pressing the relevant finger to the device's
Touch ID sensor, which is found in the round button (often referred to as the
"home" button) located at the bottom center of the front of the device. The
fingerprint sensors found on devices produced by other manufacturers have
different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the
ability to unlock the device through his or her face. For example, Apple offers
a facial recognition feature called "Face ID."  During the Face ID registration
process, the user holds the device in front of his or her face. The device's
camera then analyzes and records data based on the user's facial
characteristics. The device can then be unlocked if the camera detects a face
with characteristics that match those of the registered face. Facial recognition
features found on devices produced by other manufacturers have different
names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the
aforementioned biometric features because they are considered to be a more
convenient way to unlock a device than by entering a numeric or
alphanumeric passcode or password. Moreover, in some instances, biometric
features are considered to be a more secure way to protect a device's contents.
This is particularly true when the users of a device are engaged in criminal
activities and thus have a heightened concern about securing the contents of a
device.

16

e.  The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  The warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of HARGRAVES, to the fingerprint scanner of the device; (2) hold the device in front of the face of HARGRAVES and activate the facial recognition feature, for the purpose of

17

attempting to unlock the device in order to search its contents as authorized by this warrant.

## CONCLUSION

35.     Based on the information provided above, I respectfully submit that there is

probable cause to obtain a search warrant for the TARGET DEVICE, as more fully described in

Attachment A, to seek the items described in Attachment B. Because the TARGET DEVICE is

already in law enforcement's possession and the execution of this warrant does not involve the

physical intrusion onto a premises, I submit there is reasonable cause for the Court to authorize

execution of the warrant at any time in the day or night.


                                                    /s/ Tyler Delorme
                                                    Tyler Delorme
                                                    Special Agent
                                                    Federal Bureau of Investigation


Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone, on this  9th  day of September, 2025.


_____
HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**
**Equipment To Be Searched**

The equipment to be searched is a Black iPhone with a Black Otterbox Case, seized from Brian HARGRAVES on May 20, 2025 ("TARGET DEVICE"). The equipment is currently located at the FBI field office in Bedford, New Hampshire. This warrant authorizes the forensic examination of the equipment for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT B**
**Items to Be Seized**

I.    All records, in whatever form, that constitute evidence, fruits, or instrumentalities of 18

U.S.C. § 1512, 18 U.S.C. § 2251(a), U.S.C. §§ 2252(a)(4)(B) and (b)(2), and 18 U.S.C.

§§ 2252A(a)(5)(B) and (b)(2)), including those related to:

      a.      Any correspondence with MV1, MV2, MV3, MV4, or any other minors or their families,

      b.      records and visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256;

      c.      records or information pertaining to an interest in child pornography;

      d.      records or information pertaining to the possession, receipt, transportation, or distribution of visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256;

      e.      records or information of and relating to visual depictions that have been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct as defined in 18 U.S.C. § 2256, including the record or information used to create the visual depiction;

      f.      records or information pertaining to Purp;

      g.      records or information pertaining to SnapChat;

      h.      photo-editing software and records or information relating to photo-editing software;

    A.      For the Target Device:

        1.      evidence of who used, owned, or controlled the TARGET DEVICE;

        2.      evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

21

3.      evidence of the attachment of other computer hardware or storage media;

4.      evidence of counter-forensic programs and associated data that are designed to eliminate data;

5.      evidence of when the computer equipment was used;

6.      passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

7.      records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

II.      Serial numbers and any electronic identifiers that serve to identify the TARGET DEVICE.